Filed 3/13/26  P. v. Jaquez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051241 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. B2000439) |
| v. | |
| FROYLAN ROLDAN JAQUEZ, | |
| Defendant and Appellant. | |

In 2023, Froylan Roldan Jaquez was convicted of eight counts of child sexual abuse and sentenced to a total of 120 years in prison.  Jacquez appeals, contending that the trial court improperly admitted evidence of a complaining witness' mental health problems and hospitalization.  He also contends that the trial court erred in instructing the jury concerning Child Sexual Abuse Accommodation Syndrome (CSAAS) and using charged offenses as evidence of his propensity to commit other offenses.  Finally, Jaquez argues that the prosecutor engaged in misconduct during closing argument.  For the reasons explained below, we reject these arguments and affirm the judgment.

## I.  BACKGROUND

The facts recounted below are drawn from the record, including the evidence presented at trial, which is viewed in the light most favorable to the verdicts.  (See *People v. Banks* (2015) 61 Cal.4th 788, 795.)

## A. The Offenses

Jaquez was accused of sexually molesting three girls then under the age of 10—sisters ZH Doe and ZY Doe as well as their neighbor, L Doe—on multiple occasions from approximately 2011 to 2013. At that time, Jaquez was dating M.O., the grandmother of ZH and ZY, who lived with L's family in the same apartment building as her granddaughters. Although L is not biologically related to ZH and ZY, she was close to them and referred to them as cousins.

### 1. ZH

Jaquez began molesting ZH when she was six or seven years old, continuing until she was around nine years old, when her family moved out of the apartment. ZH recalled that Jaquez touched her chest, thighs, legs, and buttocks, and hugged her very tightly while putting his hands on her waist or chest. In addition, on one occasion, Jaquez touched ZH on her vagina. On another occasion, when ZH was in M.O.'s bedroom, her grandmother left ZH alone with Jaquez, who told ZH to lay on the bed with him and tried to kiss her.

At some point, ZH informed a neighbor about these incidents. Saying to ZH that she needed to tell her grandmother, the neighbor took ZH home to the grandmother. ZH told her grandmother, but the grandmother did not believe her. Several months later, ZH and L told L's mother that Jaquez had been molesting them. Jaquez denied the accusation and left L's apartment. L's parents did not contact police because they feared being deported.

When ZH was in seventh grade during the 2018-2019 school year, she began speaking with a therapist. Eventually ZH told her therapist about Jaquez touching her as a child, and the therapist said that she needed to report the conduct. Soon after, in December 2018, a social worker interviewed ZH. ZH told the social worker that when she was five or six years old, Jaquez had hugged her hard, kissed her on her mouth, and

touched her vaginal area over her clothes.  Later, ZH spoke with the police and disclosed that Jaquez had touched her chest or "other private places."

### 2.  ZY

ZY is ZH's younger sister.  ZY was around five to seven years old when she was abused by Jaquez.

The earliest incident that ZY recalled occurred when she was in her grandmother's room with her grandmother and Jaquez.  After her grandmother left the room to take a shower, ZY remained with Jaquez.  Jaquez approached ZY and said to her, in Spanish, "[c]ome on . . . let's do it, just once," which ZY understood to mean Jaquez wanted to kiss her.  ZY said "[n]o," but Jaquez grabbed her shoulders and kissed her.  During the kiss, which lasted approximately 10 to 30 seconds, ZY felt Jaquez's tongue on her tongue.

On another occasion, during a family gathering, ZY greeted Jaquez.  Jaquez hugged ZY, sat her in his lap, and held her as if he wanted her to stay there.  On other occasions, Jaquez touched ZY's chest.

In 2012 or 2013, after ZH and L disclosed Jaquez's molestations to L's mother, ZY's father asked her if Jaquez had ever done anything to her.  Because she was afraid of getting in trouble, ZY said he had not.  Later, when she was interviewed by a social worker, ZY again denied that Jaquez had touched her.  However, soon thereafter, while in the car with her sister and mother, ZH opened up to their mother about what Jaquez had done to her.  Once they arrived home, ZY asked ZH if she could tell her mom that the same things had happened to her.  Several months later, ZY spoke with police, telling them that on two occasions Jaquez had touched her chest.

### 3.  L

As previously noted, M.O., the grandmother of ZH and ZY, lived with L's family during the relevant time period, and Jaquez regularly visited the apartment and spent the night in M.O.'s room.  On several occasions while L was in the first, second, and third

3

grades, Jaquez touched or grabbed her, kissed her cheek and tried to kiss her on the mouth, or tried to carry her without her asking. In addition, one time when L was building a blanket fort in her living room, Jaquez reached inside the fort and grabbed her inner thighs. On another occasion, Jaquez grabbed L as she passed by, sat her down on his lap, and grabbed her chest under her shirt.

Another time, after M.O. left her bedroom to take a shower, Jaquez entered the room, closed and locked the door, and placed L on the bed. Jaquez then retrieved a vibrator from the closet, turned it on and placed it in L's hand, removed her pants and underwear, and put the vibrator against her vagina. Later, Jaquez put his mouth against L's vagina.

After L and ZH disclosed to L's mother in 2012 or 2013 that Jaquez been molesting them and Jaquez left the apartment, L stopped interacting with Jaquez. Six or seven years later, in April 2019, after ZH or ZY reported Jaquez's abuse of them, L disclosed his abuse of her to the police.

## B. The Charges

Jaquez was subsequently charged by information with seven counts of lewd and lascivious acts on a child under the age of 14 years by force, violence, duress, menace, or fear in violation of Penal Code section 288, subdivision (b)(1), and one count of oral copulation or sexual penetration with a child ten years of age or younger in violation of Penal Code section 288.7.

## C. The Trial

### 1. Victims' Testimony

At trial, which began in April 2023, the prosecutor presented testimony from ZY Doe, ZH Doe, and L Doe, who by that time who by that time were, respectively, 16, 17, and 19 years old. The witnesses described how Jaquez molested them when they were younger. For example, ZH testified that Jaquez had touched her chest, thighs, and other areas, including her vagina as well as trying to kiss her. ZY testified that Jaquez kissed

4

her, hugged her in his lap, and touched her chest.  Finally, L testified about Jaquez kissing her, touching her thighs, and grabbing her chest as well as placing a vibrator and then his mouth against her vagina.

During cross-examination, Jaquez brought up a number of delays, inconsistencies, and other uncertainties in the victims' testimony.  For example, ZH admitted that she had only a faint memory of Jaquez touching her vagina and was not sure if she was confusing her memory with one of L's, though she did tell a social worker in 2018 about the touching.  In addition, at trial, ZY admitted that at the preliminary hearing she may have gotten mixed up about some details concerning the incident in which Jaquez kissed her about which she testified at trial.  Finally, L admitted that, although she and ZH spoke about Jaquez's molestations, she did not tell ZH about the vibrator.  L also admitted that she did not tell police about the vibrator when she first spoke with them, though she did report the incident to her therapist and testified about it at the 2022 preliminary hearing.  L explained that she did not initially disclose the vibrator because she felt "grossed out by" and ashamed of it.

L also testified that she had been struggling with depression and Post-Traumatic Stress Disorder (PTSD), and that she began attending therapy during her freshman year of high school due to suicidal ideation and PTSD-related nightmares stemming from the molestations.  L also testified that she had a panic attack before testifying at the preliminary hearing in 2022.

When the prosecutor asked L whether she was hospitalized for suicidal ideation in 2021, Jaquez objected based on relevance and undue prejudice, but the trial court overruled the objection.  L then testified that she was hospitalized for reasons "to do with the same PTSD and depression" to which she previously had testified.  Jaquez subsequently objected that the prosecution had not sent him the police report mentioning hospitalization, and he moved for mistrial based on the late discovery and L's testimony concerning her mental health problems and hospitalization.  The trial court took the

5

mistrial motion under submission and later denied it, finding that the testimony was relevant to L's credibility and its probative value was not substantially outweighed by the risk of undue prejudice.

### 2. The CSAAS Testimony

The prosecutor also presented expert testimony from Dr. Blake Carmichael, a clinical psychologist, concerning CSAAS. Dr. Carmichael testified that CSAAS is used to help people understand how children who have been sexually abused tend to act and to dispel myths and misconceptions about child sexual abuse. Before Dr. Carmichael testified, the trial court instructed the jury that his testimony was "not evidence that the defendant committed any of the crimes charged against him" and that he was not "here to tell us whether or not the defendant is guilty."

Dr. Carmichael then testified that CSAAS has several components, including secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recanting or retraction. With respect to the third category—delay, conflicted and unconvincing disclosure—Dr. Carmichael testified that most children who are sexually abused do not quickly disclose the abuse, even after it has stopped. In addition, Dr. Carmichael continued, disclosure is often a process rather than a one-time event, marked by inconsistencies, in part because the victims often feel embarrassment or shame talking about sexual acts.

On cross-examination, Dr. Carmichael acknowledged that "CSAAS is not to be used to determine whether a particular child was abused."

### 3. The Defense's Case

Jaquez testified in his own defense. He denied molesting ZH, ZY, or L and, indeed, said that he never spent time alone with any of them. Jaquez also testified that he began dating another woman about a year before his relationship with M.O. ended in 2019. In addition, Jaquez presented testimony from M.O., two of his sons, and two other witnesses.

6

### 4. *Verdicts and Sentence*

On May 17, 2023, the jury found Jaquez guilty on all counts charged. On July 21, 2023, the trial court sentenced Jaquez to a total term of 120 years in prison.

Jaquez filed a timely notice of appeal on July 24, 2023.

## II. DISCUSSION

On appeal Jaquez challenges the admission of evidence concerning L's mental health and hospitalization, jury instructions concerning both CSAAS and the use of other charged offenses, and comments made by the prosecutor during closing argument. Below, we address each of these arguments.

### A. L's Mental Health and Hospitalization

Jaquez contends that evidence of L's mental health and hospitalization for suicidal ideation was improperly admitted. In particular, he argues that the evidence was irrelevant as well as unduly prejudicial and that, because of the improper admission of this evidence, a mistrial should have been declared. For the reasons explained below, we disagree.

### 1. *Relevance*

Jacquez argues that evidence of L's mental health and hospitalization, which occurred ten years after her alleged molestation, was irrelevant because it did not show that he molested her. However, the prosecutor presented this evidence for a different reason—to defend L's credibility—and the trial court properly ruled the evidence relevant for that purpose.

Only relevant evidence is admissible. (Evid. Code, § 350 ["No evidence is admissible except relevant evidence."].) (Subsequent undesignated statutory references are to the Evidence Code.) However, relevance is defined broadly. Under the Evidence Code, " '[r]elevant evidence' means evidence, *including evidence relevant to the credibility of a witness* or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

(§ 210, italics added; see also *People v. Mendoza* (2011) 52 Cal.4th 1056, 1085 ["a trial court has discretion . . . to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination"].) Consequently, "[t]he test for relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) "The trial court has broad latitude in determining the relevance of evidence" (*People v. Scott* (2011) 52 Cal.4th 452, 490), and rulings regarding the admission or exclusion of evidence based on relevance are reviewed for abuse of discretion (*People v. Cole* (2004) 33 Cal.4th 1158, 1198).

The trial court did not abuse its discretion in ruling that evidence of L's mental health problems and hospitalization was relevant to her credibility. Because Jacquez denied molesting L, the prosecutor reasonably expected him to attack L's credibility, and to defend against that attack, the prosecutor presented evidence concerning her mental health problems and hospitalization because they were "rooted in the molestations." The trial court found that L's mental health problems and hospitalization were " 'linked to the alleged molestations,' " and it later observed that victims of child sexual assault frequently suffer psychiatric problems, including suicidal ideation, which lead them to seek treatment or go to a hospital. As a consequence, the trial court had reasonable grounds for concluding that the evidence of L's mental health problems and hospitalization tended (if believed by the jury) to prove the credibility of her sexual abuse accusations and, thus, was relevant.

### 2. *Undue Prejudice*

Jaquez also argues that, even if relevant, the evidence of L's mental health problems and hospitalization was unduly prejudicial and should have been excluded. The trial court disagreed, and we find no abuse of discretion in this ruling.

Under section 352, trial courts may exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will," among other

8

things, "create substantial danger of undue prejudice . . . ." (§ 352.) However, section 352 does not protect defendants against *all* prejudicial evidence. Indeed, "evidence a defendant committed an offense . . . is inherently prejudicial." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).) Consequently, section 352 protects defendants only against evidence that causes "undue" prejudice (§ 352)—that is, evidence that "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues" (*People v. Heard* (2003) 31 Cal.4th 946, 976 (*Heard*)) or that "poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724). Moreover, under section 352, evidence may be excluded based on undue prejudice "only when its probative value is *substantially* outweighed by its prejudicial effect." (*Tran*, at p. 1047.)

The trial court reasonably determined that the danger of undue prejudice did not substantially outweigh the probative value of the testimony that L was hospitalized for suicidal ideation stemming from the depression and PTSD caused by her sexual abuse as a child. As noted above, the trial court found that the evidence was probative of L's credibility because it tended to show that she had suffered some trauma, which child sexual abuse often causes. Moreover, the prejudicial impact, if any, of the evidence was limited. The testimony concerning L's mental health and hospitalization was brief and limited to a few lines of questioning and testimony, which did not go into graphic detail or explore the extent of L's trauma or treatment. Consequently, the trial court did not abuse its discretion in concluding that the probative value of this testimony was not substantially outweighed by the danger of undue prejudice.

Jaquez argues that evidence of L's mental illness and hospitalization was prejudicial because it elicited sympathy for L's suffering, and, as jurors would blame him for that suffering, it evoked an emotional bias against him. However, under section 352, " 'prejudice' does not mean damage to a party's case that flows from relevant, probative

9

evidence." (*People v. Cortez* (2016) 63 Cal.4th 101, 128.) Undue prejudice "refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome." (*People v. Booker* (2011) 51 Cal.4th 141, 188; see also *People v. Valdez* (2012) 55 Cal.4th 82, 145 ["[T]he test for prejudice under Evidence Code section 352 is . . . whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction."].) Even if "graphic [or] unpleasant," evidence that merely "portray[s] the results of" a defendant's conduct is not unduly prejudicial in this sense. (*Heard*, *supra*, 31 Cal.4th at pp. 976-977 [holding that crime scene photographs were not unduly prejudicial].) Moreover, even if there were some undue prejudice here, as noted above, the passing references to L's mental health problems and hospitalization were not so inflammatory as to pose such an "intolerable risk" to the fairness of the proceedings.

Consequently, we conclude that the trial court did not abuse its discretion by admitting evidence of L's mental health problems and hospitalization.

### 3. *Motion for Mistrial*

Jaquez argues that the trial court should have granted a mistrial. We review denials of a mistrial for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) To the extent that Jaquez's mistrial argument is based on admission of evidence of L's mental health problems and hospitalization, we find no abuse of discretion because, as shown above, the evidence was properly admitted. To the extent Jaquez's mistrial argument is based on the late production of a police report describing L's hospitalization, we find no abuse for the reasons stated below.

Defense counsel represented that, during the first week of trial, the prosecutor mentioned a police report, which he had not produced, but indicated that he would do so. Although the prosecutor did not produce the report, defense counsel assumed that the prosecutor had mentioned the report because it contained evidence about L's mental

10

health struggles that the prosecutor considered exculpatory, and defense counsel did not follow up with the prosecutor because counsel was not interested in using evidence of L's struggles. However, when the prosecutor introduced evidence of L's struggles in support of the case against Jaquez, defense counsel objected and requested a mistrial based on the failure to produce the police report. In response to defense counsel's objection, the prosecutor emailed the police report to defense counsel and the trial court, and the trial court offered defense counsel a continuance to conduct due diligence. However, rather than requesting a continuance, defense counsel asked the trial court to subpoena L's hospital records. The trial court did so and shared the records with the parties. After reviewing these records, defense counsel stated that nothing in them indicated a need to further cross-examine L and that a continuance was not required. Jaquez still requested a mistrial, but based on questions eliciting L's testimony regarding her need for therapy and her hospitalization rather than the failure to produce the police report concerning the hospitalization.

The trial court denied the motion. In so doing, it observed that L's hospital records did not contain any exculpatory information and that Jaquez had failed to identify any prejudice of a constitutional nature from the prosecutor's earlier failure to disclose the police report describing L's hospitalization. In addition, to ensure that Jaquez was not prejudiced, the court allowed him to recall L or call other witnesses concerning the hospitalization.

The trial court did not abuse its discretion in denying a mistrial but permitting Jaquez to present additional testimony. A mistrial should be granted only if a court " ' "is apprised of prejudice that it judges incurable by admonition or instruction" ' " and a "defendant's ' " ' "chances of receiving a fair trial have been irreparably damaged." ' " ' " (*People v. Williams* (2016) 1 Cal.5th 1166, 1185.) Here, the trial court reasonably and properly determined that any prejudice from failure to produce the police report concerning L's hospitalization could be cured by disclosing her hospital records

11

and affording Jaquez the opportunity to present additional relevant testimony. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 466-470 [mistrial for delayed disclosure properly denied where remedies were provided and defendants "had an opportunity to address the late-disclosed evidence."].)

Accordingly, we conclude that the trial court did not abuse its discretion in denying a mistrial.

## B. The CSAAS Instruction

Jaquez also contends that the trial court erred in instructing the jury on CSAAS evidence. Although the trial court used CALCRIM No. 1193, the standard instruction concerning CSAAS developed by the Judicial Council, Jaquez contends that the instruction was erroneous because it failed to affirmatively state that CSAAS evidence may not be used "to determine whether the victim[s'] molestation claim[s are] true." Reviewing the instruction de novo (*People v. Mitchell* (2019) 7 Cal.5th 561, 579), we conclude that there was no error.

"The purpose of CSAAS is to understand a child's reactions when they have been abused." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*).) CSAAS explains " 'the emotional antecedents of abused children's seemingly self-impeaching behavior,' " including "delay in reporting." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 (*McAlpin*).) Accordingly, "[w]hile CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Consequently, the Supreme Court has long held CSAAS evidence admissible to disabuse jurors of commonly held misconceptions about child sexual abuse. (*McAlpin*, at pp. 1301-1302.)

Using an earlier version of CALCRIM No. 1193 (see Judicial Council of Cal. Criminal Jury Instructions (Sept. 2022 supp.) pp. iii, 62-63), the trial court instructed the

12

jury: "You have heard testimony from Dr. Blake Carmichael regarding Child Sexual Abuse Accommodation Syndrome. . . . Dr. Blake Carmichael's testimony about the Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [ZH] Doe, [ZY] Doe, or [L] Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

This instruction has been upheld repeatedly. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 219; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816 (*Ortiz*); *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176; *People v. Munch* (2020) 52 Cal.App.5th 464, 474; *Gonzales*, *supra*, 16 Cal.App.5th at p. 504; *People v. Flores* (2024) 101 Cal.App.5th 438, 458-459.) As one decision explained, "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [CSAAS] testimony to conclude that [a victim's] behavior does not mean she lied when she said she was abused," but the juror also would understand that he or she "cannot use [CSAAS] testimony to conclude [the victim] was, in fact, molested." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.) In other words, reasonable jurors understand that under CALCRIM No. 1193 "CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*Ibid*.)

Jaquez urges us to depart from this authority. He contends that, by permitting the jury to use CSAAS testimony in "evaluating the believability" of a witness' testimony, CALCRIM No. 1193 permitted jurors to use CSAAS testimony to support the truth of the victims' allegations. However, during Dr. Carmichael's testimony, the trial court expressly admonished the jury that CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him," and Dr. Carmichael was "not here to tell us whether or not the defendant is guilty." Dr. Carmichael likewise acknowledged on cross-examination that "CSAAS is not to be used to determine whether a particular child was abused." And in the instruction at the close of trial, the trial court reminded the jury

that Dr. Carmichael's CSAAS testimony was "not evidence that the defendant committed any of the crimes charged" and should be considered "only" in determining if the alleged victims' conduct was "not inconsistent with the conduct of someone who has been molested." As "[w]e presume the jurors understood and followed the instructions" given them (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180), we conclude that the jury understood the trial court's instruction did not authorize them to use Dr. Carmichael's testimony as evidence that Jaquez committed the crimes charged.

Jaquez also asserts that CALCRIM No. 1193 "lessened the prosecution's burden of proving guilty beyond a reasonable doubt." Although he asserts that the instruction may have misled the jury into using CSAAS testimony to bolster the credibility of the complaining witnesses, he fails to explain how that changed the burden of proof. Consequently, we deem this argument abandoned. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845 [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." ' "] (*Phoenix*).)

We conclude that the trial court did not err in instructing the jury on CSAAS.

## C. CALCRIM 1191B

Jaquez next contends that the trial court erred by instructing the jury pursuant to CALCRIM No. 1191B that it could consider the evidence of any charged offense proven beyond a reasonable doubt as proof he had a propensity to commit sex crimes.[1] Jaquez

---

[1] The trial court's instruction provided: "The People presented evidence the defendant committed the crime of lewd or lascivious act on a child under the age of 14 by force, violence, duress, menace, or feat charged in . . . Counts 1 through 7. The People presented evidence the defendant committed the crimes of oral copulation with a child ten years of age or younger charged in Count 8. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence [in the case].

14

contends this instruction violated his right to due process by allowing the jury to use a guilty verdict on one count to infer guilt on the remaining counts. As Jaquez concedes, the California Supreme Court rejected this argument in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*). Although Jaquez contends that *Villatoro* was wrongly decided and should be reconsidered, we are bound by that decision and cannot depart from it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see also *People v. Meneses* (2019) 41 Cal.App.5th 63, 68 [*Villatoro* dispositive of defendant's due process challenge to CALCRIM No. 1191B].)

## D. Prosecutorial Misconduct

Jaquez also argues that the prosecutor committed misconduct during closing argument. In particular, he contends that the prosecutor impermissibly shifted the burden of proof to the defense by suggesting to the jury that Jaquez should have introduced evidence that the alleged victims were lying. We reject these arguments. Although Jaquez acknowledges that his counsel did not object at trial to the prosecutor's comments, he contends that as a result of this failure he received ineffective assistance of counsel. In light of this contention, we exercise our discretion to reach the merits of Jaquez's challenge. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) As explained below, we conclude that there was no misconduct.

### 1. Relevant Legal Principles

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) In addition, where a prosecutor's misconduct does not render a trial fundamentally unfair, the misconduct violates California law if it involves " ' " 'the use of deceptive or

---

It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must prove each charge beyond a reasonable doubt." (CALCRIM No. 1191B.)

15

reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citations.]" (*Ibid.*) To establish such misconduct "bad faith on the prosecutor's part is not required." (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)

In closing argument, prosecutors are " ' "given wide latitude." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 796 (*Peoples*).) In particular, "[a] prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them." (*People v. Martinez* (2010) 47 Cal.4th 911, 958 (*Martinez*); see also *Peoples*, at p. 796.) Consequently, comments on the "relative quality and strength" of a witness' testimony do not constitute misconduct. (*People v. Ward* (2005) 36 Cal.4th 186, 216; see also *People v. Leonard* (2007) 40 Cal.4th 1370, 1407; *People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*).)

However, a prosecutor may not vouch for the credibility of a witness. (*Rodriguez, supra*, 9 Cal.5th at p. 480.) " 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.]" (*Ibid.*; see also *Martinez, supra*, 47 Cal.4th at p. 958 ["A prosecutor . . . may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record."].) Because vouching "usually involves an attempt to bolster a witness by reference to facts *outside* the record," statements by prosecutors that are "*based on the record*, regarding the apparent honesty or reliability of prosecution witnesses" do not constitute improper vouching. (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

In short, while a prosecutor may not state " 'that a defendant has a duty or burden to produce evidence, or . . . to prove his or her innocence,' " he or she may permissibly comment "that a defendant has not produced any evidence." (*People v. Steskal* (2021) 11 Cal.5th 332, 352; see also *People v. Wash* (1993) 6 Cal.4th 215, 263.)

16

### 2. The Closing Argument

During closing argument, the prosecutor argued repeatedly that the victims had no reason to lie. In particular, the prosecutor stated: (1) "These three girls have absolutely nothing to gain from this process," (2) "[t]he only other conclusion in this case other than that these girls are telling the truth and that he did these things, the only other conclusion is that you have to find the girls came in here and each lied," (3) "[y]ou would have to find ultimately that they had conspired with each other to frame an innocent man . . . ," (4) "[L] Doe has absolutely no reason to make up being abused," (5) "[ZH] Doe similarly has no reason to make it up," (6) "[ZY] has absolutely no reason to make up abuse," (7) "The bottom line is that these are not sophisticated, evil, conniving people trying to frame an innocent man," and (8) "[i]n this case there is no reason for these girls to have made everything up about it. You would have to believe that they are evil, sick, twisted individuals framing an innocent [*sic*] . . . ."

In addition, the trial court instructed the jury that "[a] defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt." During his closing argument, the prosecutor reiterated this point, saying no less than three times that "[t]he People have the burden of proof." The prosecutor also told the jury that "there is no burden on the Defense, and the burden does not shift to the Defense at any point in this case."

### 3. Analysis

In arguing that the victims' testimony was credible, the prosecutor permissibly commented on the evidence in the record and did not engage in any improper vouching. In addition, in light of the trial court's instruction and the prosecutor's embrace of that instruction, the prosecutor did not shift the burden of proof to the defense.

The prosecutor properly commented on the credibility of ZH, ZY, and L based on evidence in the record. For example, because each witness testified that Jaquez had ceased to be in their lives long before they reported his offenses, the prosecutor properly

17

noted that they had "no reason to make up abuse" and "nothing to gain" from their testimony. Indeed, each of the victims testified that the criminal proceedings were uncomfortable in some way, such as L's testimony that she experienced a panic attack at the preliminary hearing, ZH's testimony that she was "nervous" and felt "overwhelming" and "not . . . pleasant feeling[s]" seeing Jaquez in court, and ZY's testimony that she was "nervous" and uncomfortable seeing Jaquez in court. Similarly, the prosecutor's comment that the victims were "not sophisticated, evil, conniving people trying to frame an innocent man" was supported by ZH's testimony that she was unaware that her therapist was a mandated reporter when she disclosed Jaquez's abuse, as well as L's testimony that she told her therapist that she did not want to press charges. In addition, the prosecutor did not improperly vouch for the victims by suggesting that the jury should credit their testimony based on knowledge unavailable to them or the prosecutor's personal prestige or knowledge.

The Supreme Court rejected a claim of prosecutorial misconduct in a similar situation. In *Rodriguez*, *supra*, 9 Cal.5th 474, during closing argument, the prosecutor asked what motive a police officer who testified had to lie. (*Id*. at p. 479.) The Supreme Court found that this comment was proper because it was based on the record and "it did not 'suggest the prosecutor had personal knowledge of facts outside the record showing [the witness] was telling the truth' or 'invite[] the jury to abdicate its responsibility to independently evaluate for itself whether [the witness] should be believed.' " (*Id*., at pp. 480-481; but see *id*. at p. 481 [holding that the prosecutor impermissibly vouched for the police officer by asserting that he would not have put his career at risk by lying].) Similarly, in this case, it was proper for the prosecutor to point out that the victims had nothing to gain from incriminating Jaquez, especially in light of the evidence supporting that contention.

Jaquez asserts that the prosecutor impermissibly shifted the burden of proof onto him. According to Jaquez, by arguing to the jury that, to reject the victims' testimony, it

18

"would have to ultimately find that [the victims] had conspired . . . to frame an innocent man," or that it "would have to believe that they are evil, sick, twisted individuals framing an innocent [*sic*]," the prosecutor "essentially shift[ed] the burden of proof." However, Jaquez offers no analysis or reasoned argument to support this assertion, and we therefore treat it as abandoned. (*Phoenix*, *supra*, 47 Cal.4th at p. 845 [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." ' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."].)

Moreover, even if we were to consider this argument, we would reject it. In determining whether prosecutors misled the jury during closing argument, courts " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Instead, courts examine, " '[i]n the context of the whole argument and the instructions,' " whether there was " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*Centeno*, *supra*, 60 Cal.4th at p. 667.) There is no such likelihood here. As noted above, the trial court instructed the jury that the People bore the burden of proof, and far from suggesting otherwise, the prosecutor repeatedly acknowledged this burden during closing argument. Indeed, the prosecutor expressly informed the jury that "the burden does not shift to the Defense at any point in this case." In light of this statement, no reasonable jury could have interpreted the prosecutor's comments to shift the burden of proof to Jaquez.

We therefore conclude that there was no prosecutorial misconduct warranting reversal.

### E. Cumulative Error

Finally, Jaquez contends that the cumulative effect of the errors was prejudicial and violated his right to a fair trial.  Under the cumulative error doctrine, "the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually."  (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1019.)  However, where, as here, no error is shown, there is no prejudicial error to cumulate.  (See *Ortiz*, *supra*, 96 Cal.App.5th at p. 816; *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### III.  DISPOSITION

The judgment is affirmed.

_____
BROMBERG, J.


WE CONCUR:


_____
GREENWOOD, P. J.


_____
DANNER, J.


*People v. Jaquez*
H051241